IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BERNARD SMITH, #352981 | * | |
| Plaintiff, | | |
| v. | * | CIVIL ACTION NO. JFM-15-743 |
| | | |
| CORIZON, INC. | * | |
| WEXFORD HEALTH SOURCES, INC. | | |
| WARDEN OF NORTH BRANCH | * | |
| CORRECTIONAL INSTITUTION | | |
| SECRETARY FOR THE MARYLAND | * | |
| DEPARTMENT OF PUBLIC SAFETY & | | |
| CORRECTIONAL SERVICES | * | |
| Defendants. | | |

\*\*\*\*\*

## MEMORANDUM

Self-represented inmate Bernard Smith ("Smith") filed a 42 U.S.C. § 1983 complaint. ECF No. 1.  Defendant Wexford Health Services, Inc. ("Wexford"), by their counsel, filed a motion to dismiss or, in the alternative, motion for summary judgment.   ECF No. 14. Defendants Warden and Secretary have likewise filed a motion to dismiss or, in the alternative, motion for summary judgment. ECF No. 28. Smith has filed an opposition,  ECF No. 32, and Wexford has filed a reply.[1]   ECF No. 33.  A hearing is not needed to resolve the issues. *See* Local Rule 106.5 (D. Md. 2014).  For reasons to follow, Defendants' Motions for Summary Judgment are granted and the complaint against defendant Corizon, Inc. shall be dismissed.[2]

### BACKGROUND

---

[1]    Wexford moves to have attached medical record exhibits sealed, claiming that they are of a personal and sensitive nature and should be shielded by the court.  ECF Nos. 15 & 34.  The motions to seal shall be granted.

[2]    Corizon, Inc. was the healthcare contractor for the Maryland Department of Public Safety and Correctional Services prior to July 1, 2012.  Although it has not been served in the case, the complaint against it shall be dismissed for Smith's failure to set out an Eighth Amendment claim.

**Plaintiff's Allegations**

In his Complaint, Smith, an inmate housed at the North Branch Correctional Institution ("NBCI") in Cumberland, Maryland, claims that he has been denied medical care for the "slowly progressive, but fatal disease" hepatitis C ("HVC"). ECF No. 1. He alleges that the Department of Public Safety and Correctional Services ("DPSCS") is "standing by and not acting..." *Id.* Smith seeks treatment and $1,000,000.00 in damages.

## STANDARD OF REVIEW

This court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 378 (2007); *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). Such review liberally construes Smith's pleadings in light of the fact that he is self-represented. *See Gordon v. Leek,* 574 F.2d 1147, 1151 (4th Cir. 1978).

The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint. *See Burney v. Cuccinelli,* 616 F.3d 393, 408 (4th Cir. 2010). A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff." *Brockington v. Boykins,* 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion. *See Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). If the court docs consider matters outside the pleadings, "the motion must be

treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a

reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P.

12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.,* 109 F.3d 993, 997

(4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot

be regarded as one for summary judgment until the district court acts to convert the motion by

indicating that it will not exclude from its consideration of the motion the supporting extraneous

materials."). This court deems it appropriate to consider the extraneous materials, as they are

likely to facilitate disposition of this case. Accordingly, defendants' "alternative motions" shall

be treated as motions for summary judgment.

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme

Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its

very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v.

Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club,

Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence in the light most favorable to…the nonmovant, and draw all

reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir.1993)) (internal quotation marks omitted) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. S*ee Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore,* 721 F.3d 264, 283 (4th Cir. 2013) (citation omitted). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (citation and internal quotation marks omitted). This case shall be analyzed in light of this standard of review.

A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus,* 551 U.S. at 89, 94 (2007); *Cruz v. Beto,* 405 U.S. 319 (1972). The requirement of liberal construction does not mean the court can ignore a clear failure in the pleadings to allege facts which set forth a claim, *see Weller v. Department of Social Services,* 901 F.2d 387, 391 (4th Cir. 1990), or assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## ANALYSIS

Title 42 U.S.C. § 1983 " 'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.' " *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). A suit under § 1983

4

allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege that (1) a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins,* 487 U.S. 42, 48 (1988).

### Defendant Wexford (Medical Defendant)

With regard to the claims raised against defendant Wexford, a contractual prison health care provider, the Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia,* 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De Lonta v. Angelone,* 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter,* 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to his serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *see also Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir. 2008). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious.[3]  *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care).  Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition.  *Farmer,* 511 U.S. at 839-40.  "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce,* 129 F. 3d 336, 340 n. 2 (4th Cir. 1997).  "Actual knowledge or awareness on the part of the alleged inflicter...becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center,* 58 F. 3d 101, 105 (4th Cir. 1995), quoting *Farmer,* 511 U.S. at 844.   If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer,* 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *Brown,* 240 F. 3d at 390; citing *Liebe v. Norton,* 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).  Inmates do not have a constitutional right to the treatment of their choice, *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir. 1986), and disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury.  *See Estelle,* 429 U.S. at 105-06;  *Wright*

---

[3]  A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko,* 535 F.3d at 241, citing to *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999).

*v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

Wexford argues that it may not be held liable under a *respondeat superior* theory.   It further maintains that in January of 2012, the DPSCS issued an updated policy regarding HCV infection control, providing that all persons testing positive for HCV be enrolled in the Chronic Care Clinic ("CCC"), so they can be monitored and educated regarding their condition.  ECF No. 14-4.  Individual treatments are considered for inmates diagnosed with HCV by a DPSCS Panel, comprised of health and mental health providers, pharmacists, and infectious disease specialists. Wexford asserts that the primary HCV treatment approved for system-wide care is Pegylated Interferon[4]/Ribavirin,[5] a widely-used antiviral medication.

Smith is a 61-year-old male inmate at NBCI who suffers from hypertension, hyperlipidemia, diabetes mellitus and has a medical history of HCV.   ECF No. 14-5 & 14-6.

---

[4]       Interferons are a family of naturally-occurring proteins that are made and secreted by cells of the immune system (for example, white blood cells, natural killer cells, fibroblasts, and epithelial cells). Three classes of interferons have been identified: alpha, beta, and gamma.  Each class has many effects, though their effects overlap.  Commercially available interferons are human interferons manufactured using recombinant DNA technology. The mechanism of action of interferon is complex and is not well understood. Interferons modulate the response of the immune system to viruses, bacteria and other foreign substances that invade the body. Interferons do not directly kill viral cells; they boost the immune system response and reduce the growth of cells by regulating the action of several genes that control    the    secretion    of    numerous    cellular    proteins    that    affect    growth.    *See* http://www.medicinenet.com/interferon/article.htm.  The pegylation process of interferon changes the properties of the interferon to allow for once-weekly dosing, more stable interferon blood concentrations through the dosing interval, and improved efficacy. *See* Hepatitis C virus disease: immunobiology and clinical applications([Online-Ausg.] ed.). New York: Springer. p.237ISBN978-0-387-71375-5.

[5]       Ribavirin is used with an interferon medication such as peginterferon alfa-2a [Pegasys] or peginterferon alfa-2b [PEG-Intron] to treat HCV in people who have not previously been treated with interferon.  Ribavirin is in a class of antiviral medications called nucleoside analogues.  It works by stopping the virus that causes HCV from spreading inside the body.  It is not known if treatment that includes ribavirin and another medication cures HCV infection, prevents liver damage that may be caused by    HCV,    or    prevents    the    spread    of    HCV    to    other    people.    *See* https://www.nlm.nih.gov/medlineplus/druginfo/meds/a605018.html#why.

Smith was provided Pegylated Interferon/Ribavirin treatment for 48 weeks in 2011, but relapsed in 2012. ECF No. 14-5 & 14-6. On July 3, 2012, Smith was seen by Dr. Colin Ottey on a CCC visit for Smith's HCV and other issues. He complained of sweats and chills, but denied abdominal distention or pain, blood in stool, bruising, jaundice, lethargy, nausea, vomiting, weight loss or gain, pruritus, [6] tremors, and sleep pattern changes. ECF No. 14-6 at pp. 1-3    On September 24, 2012, Smith was seen by Physician's Assistant ("PA") Greg Flury and denied any complaints.    *Id.* at pp. 4-6. On October 2, 2012, he was seen by Dr. Ottey for a scheduled CCC visit and raised complaints of blood in stool and pruritus. No other symptoms were noted. Ottey ordered lab work be drawn and analyzed. *Id.* at pp. 7-9. On January 1, 2013, Smith was seen by PA Jonas Merrill in the CCC for his HCV condition. He denied he was experiencing any symptoms. *Id.* at pp. 10-12. On April 1, 2013 and June 26, 2013, Smith was seen by PAs Flury and Katie Winner for his HCV condition. Both PAs noted that Smith had received HCV treatment in 2011, but had relapsed. He voiced no complaints regarding his HCV at those times. *Id.* at pp. 13-18.

On September 16, 2013, Smith presented three stool cards, which all tested negative for occult blood. *Id.* at p. 19. On September 24, 2013 and December 19, 2013, Smith was seen by PAs Flury and Winner for CCC visits associated with his chronic conditions, including HCV. He raised no complaints related to his HCV nor did he claim any recent exacerbation, fatigue or malaise. *Id.* at pp. 20-25.

---

[6]    Pruritus or itch is defined as an unpleasant sensation of the skin that provokes the urge to scratch. It is a characteristic feature of many skin diseases and an unusual sign of some systemic diseases. Pruritus may be localized or generalized and can occur as an acute or chronic condition.    *See* http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/dermatology/pruritus-itch/.

Three months later, on March 3, 2014, Smith was seen by Dr. Ava Joubert for his scheduled CCC visit.   Although he was asymptomatic, Joubert ordered various blood panels to be drawn and tested. *Id*. at pp. 26-28.  On May 2, 2014, Smith was seen by Nurse Krista Swan due to his multiple complaints of stomach pain, an overactive bladder, nausea and blood in stool. Swan conducted an examination, noted bowels sounds were positive in all four quadrants, provided him a urine cup and stool cards, and referred Smith to a provider for further evaluation. *Id*. at pp. 29-30.  One week later on May 9, 2014, Smith was seen by Dr. Joubert for his claim of chronic abdominal discomfort related to chronic aching and bloating, aggravated by constipation. Smith further complained of blood in stool, eructation (belching), heartburn, acid regurgitation and nausea.  He noted relief with Maalox.  Joubert's examination suggested an enlarged prostate and she requested an evaluation for a colonoscopy.  She increased Smith's Cardura[7] medication, decreased his Lisinopril and aspirin regimens, stopped his Motrin, and ordered a  urinalysis and x-ray of Smith's abdomen. *Id*. at pp. 31-33.  The abdominal x-ray, read on May 14, 2014, revealed no acute abnormalities. *Id*. at p. 59.

From May 28, 2014 through August 7, 2014, Smith was routinely seen by nurses for CCC visits and voiced no symptoms related to his chronic conditions. *Id*. at pp. 34-40.   On August 15, 2014, he inquired into a repeat liver biopsy related to his HCV, was educated on the protocol for anti-viral therapy, and examined the liver specialist's recommendations from February of 2012.  ECF No. 14-6 at p. 41.   On August 19, 2014, Smith was seen by Dr. Ottey for a CCC visit.  He denied any symptoms associated with his HCV condition. *Id.* at pp. 42-44.

---

[7]      Cardura is used alone or with other drugs to treat high blood pressure.  In addition, it may be used in men to treat the symptoms of an enlarged prostate. *See* http://www.webmd.com/drugs/2/drug-3710/cardura+oral/details.

On November 4, 2014, Smith placed a sick-call slip inquiring about new treatments for HCV. Two days later he was seen by Nurse Clark for a CCC visit regarding his chronic condition. It was noted that his HCV was stable. ECF No. 14-6 at pp. 45-47. From November 13, 2014 to March 18, 2015, Smith was seen by nurses and physicians for CCC visits and voiced no symptoms related to his chronic conditions. *Id.* at pp. 48-57.

Wexford affirms the Smith has essentially been asymptomatic from HCV at all times relevant to his complaint, but expressed abdominal discomfort and blood in his stool in May of 2014. ECF No. 14-5, Ottey Aff. Smith is seen every three months in the CCC for his HCV, at which time his lab work is regularly examined and evaluated. Wexford maintains that although Smith has been largely asymptomatic for the past 24 months, Dr. Ottey has recommended that he be referred to the HCV panel to decide if he is a candidate for new HCV treatments. *Id.*

In opposing the summary judgment motions Smith acknowledges that he was treated with Interferon/Ribavirin in 2011, but it did not cure his HCV. ECF No. 32. He claims that he has been suffering from abdominal pain and blood in stool for a number of years. Smith contends that medical professionals have found a much better and more effective treatment for HCV and seemingly questions why he is not receiving the drug "Horvoni" ECF. No. 32. He asks why his condition should be allowed to get worse and it be acceptable for defendants to simply monitor his situation with chronic care reviews.

In its reply Wexford indicates that since the filing of its dispositive motion, Smith was seen in June of 2015 by Dr. Gebrye Rufael, a specialist in endocrinology diabetes and

10

metabolism, to determine if he was a candidate to receive Harvoni.[8]  Wexford argues that as Smith was asymptomatic at that time, Dr. Rufael found that he was not a priority candidate for Harvoni and informed Smith that "the higher the grade and stage" patients would be "treated first" with Harvoni; and that he would continue to be monitored in the CCC on a quarterly basis. ECF No. 34-2.  In July and October of 2015, Smith was seen in the CCC by Dr. Ashraf for his chronic conditions, including HCV.  He had no complaints of fever, jaundice, fatigue, tiredness, rashes, weight loss or weight gain.  *Id.*

Although hepatitis likely constitutes a serious medical need sufficient to satisfy the objective component of an Eighth Amendment analysis, *see, e.g., Owens v. Hutchinson,* 79 Fed. Appx. 159, 181 (6th Cir. 2003) (prison medical officials did not violate inmate's Eighth Amendment right to adequate medical care by failing to treat his hepatitis C virus with Interferon and Ribavirin), the complaint fails to allege conduct rising to the level of deliberate indifference. Smith was treated with Pegylated Interferon/Ribavirin in 2011 and 2012, but his HCV did not respond to the treatment and, thus, sustained eradication of HCV was not accomplished. Wexford states that despite the non-response to the treatment, Smith has been "essentially asymptomatic" from HCV except for occasional reports of abdominal discomfort.  Wexford denies that Smith has become more ill over the period of time he alleges new and improved drugs were developed but were not made available to him.  Smith is seen in the CCC every three months for his HCV and other chronic conditions.  Blood panels are routinely taken and

---

[8]     Harvoni is used to treat HCV in adults and contains a combination of ledipasvir and sofosbuvir. Ledipasvir and sofosbuvir are antiviral medications that prevent HCV cells from multiplying in a body. *See* http://www.drugs.com/harvoni.html.

evaluated, ultrasound tests are taken of his abdomen and his possible symptoms are monitored. To date, no abnormalities have been noted.

As numerous courts have acknowledged, HCV does not require treatment in all cases. *See, e.g., Johnson v. Wright,* 412 F.3d 398, 400 (2d Cir. 2005) ("New York State Department of Corrections [ ] policy generally forbids the prescription of hepatitis C medication to any prisoner with evidence of active substance abuse within the preceding two years."); *Iseley v. Dragovich,* 90 Fed.Appx. 577, 581 (3d Cir. 2004) ("Interferon treatment was contraindicated in [plaintiff's] case because his condition had not yet progressed to the point where such treatment would have been appropriate."); *Edmonds v. Robbins,* 67 Fed.Appx. 872, 873 (6th Cir. 2003)

Wexford is entitled to summary judgment in its favor. In granting summary judgment the court in no way implies that Smith is not entitled to future medical treatment for his condition. That right to treatment, however, is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977). The record evidence indicates that Smith has no symptoms associated with his HCV condition, yet continues to be proactively evaluated and tested.

The fact that Smith's request to receive Harvoni treatment has been denied simply does not reflect deliberate indifference on the part of Wexford. He was repeatedly seen by prison nurses, PAs and physicians for his chronic conditions, including HCV. He remains asymptomatic. Smith's grievances with the medical decisions made regarding what particular treatments are necessary in light of the symptoms presented are reflective of his frustration, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do

12

not state a §1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985), citing *Gittlemacker v. Prasse,* 428 F.2d 1, 6 (3rd Cir. 1970). There are no exceptional circumstances presented in this case.

### Defendants Secretary and Warden  (State Defendants)

The State Defendants assert that Smith's claims filed against them are dismissible under Rule 12(b)(6) and Rule 56 on grounds of lack of personal participation, *respondeat superior*, the failure to demonstrate a violation of the Eighth Amendment, and qualified immunity.

### I. Respondeat Superior

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Under § 1983, individual liability must be based on personal conduct. *See Wright v. Collins,* 766 F.2d 841, 850 (4th Cir. 1985); *see also Foote v. Spiegal,* 118 F.3d 1416, 1423 (10th Cir. 1997). Further, absent subjective knowledge, a prison official is not liable. *Farmer v. Brennan,* 511 U.S. 825, 847 (1994); *see Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998).

In addition, defendants Warden and Secretary may not be held liable under a theory of *respondeat superior.* Under *Shaw v. Stroud,* 13 F.3d 791 (4th Cir. 1994), supervisory liability may attach under § 1983 if a plaintiff can establish three elements. These are: (1) "that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) "that the supervisor's response to that knowledge was so inadequate as to show

'deliberate indifference to or tacit authorization of the alleged offensive practices' ";[9] and (3)
"that there was an 'affirmative causal link' between the supervisor's inaction and the particular
constitutional injury suffered by the plaintiff." *Id.* at 799 (citations omitted).

Further, § 1983 liability on the part of supervisory defendants requires a showing that:
"(1) the supervisory defendants failed promptly to provide an inmate with needed medical care,
(2) that the supervisory defendants deliberately interfered with the prison doctors' performance,
or (3) that the supervisory defendants tacitly authorized or were indifferent to the prison
physicians' constitutional violations." *Miltier v. Beorn*, 896 F. 2d 848, 854 (4th Cir. 1990)
(internal citations omitted).   There is no allegation or showing demonstrating the State
Defendants' supervisory liability with regard to the alleged denial of medical care. *See Shaw*, 13
F.3d at 799; *Miltier*, 896 F. 2d at 854.  There is no evidence that the Warden and Secretary had
actual or constructive knowledge that medical staff were ignoring Smith's complaints regarding
his HCV treatment and that the denial of care posed "a pervasive and unreasonable risk" of
constitutional injury to Smith.  Plainly they are entitled to rely on the medical expertise of trained
health care professionals and the mere fact that Smith's administrative remedy procedure
("ARP") grievance regarding his HCV care was found to be without merit (*see* ECF No. 28-6)
does not evidence that they tacitly authorized unconstitutional behavior in regard to his medical
treatment.    The liability of supervisory officials "is not based on ordinary principles of
respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit

---

[9]       Further, in establishing "deliberate indifference" under this second prong, a plaintiff
"[o]rdinarily...cannot satisfy his burden of proof by pointing to a single incident or isolated
incidents...for a supervisor cannot be expected...to guard against the deliberate criminal acts of his
properly trained employees when he has no basis upon which to anticipate the misconduct." *Slakan v.
Porter,* 737 F.2d 368, 373 (4th Cir. 1984).  Deliberate indifference, however, may be satisfied by showing
"[a] supervisor's continued inaction in the face of documented widespread abuses." *Id.*

authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' *Bayard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001), citing *Slaking v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984). Smith's claim with regard to the Warden and Secretary is based on their supervisory positions, as they do not appear to have been personally involved in the matter at issue. There is no evidence to suggest that they had actual or constructive knowledge of the matter at issue here.

## CONCLUSION

Having found no genuine dispute of material fact justifying a trial on the merits in this case, defendants' dispositive motions, converted to motions for summary judgment, shall be granted. A separate Order shall be entered forthwith.

Date: December *17*, 2015

J. Frederick Motz
United States District Judge

DEPUTY                    BY

AT BALTIMORE
CLERK'S OFFICE

2015 DEC 17  PM 4: 04                    15

DISTRICT OF MARYLAND
U.S. DISTRICT COURT
FILED